Filed 4/18/14  In re E.H. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re E.H. et al., Persons Coming Under the Juvenile Court Law. | |
| L.S.,<br><br>　　　　Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>　　　　Respondent;<br><br>CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>　　　　Real Party in Interest. | A141162<br><br>(Contra Costa County<br>Super. Ct. No. JI3-00583, JI3-00584, JI3-00585) |

　　　　By this petition for an extraordinary writ (Cal. Rules of Court, rule 8.452), petitioner L.S., the mother of three children all under the age of four, seeks to vacate the order of respondent Superior Court of Contra Costa County setting a hearing to terminate her parental rights in accordance with Welfare and Institutions code section 366.26.[1] Petitioner's sole contention is the court erred in terminating reunification services after six months.  As part of her contention, petitioner also argues that the reunification plan

_____

[1] Statutory references are to the Welfare and Institutions Code unless otherwise indicated.

1

and services made insufficient provision for her mental illness.  We conclude these contentions are without merit, and deny the petition on its merits.

## BACKGROUND

The history of these dependencies will not require a lengthy narrative.[2]  The record, viewed in conformity with *In re Zeth S*. (2003) 31 Cal.4th 396, shows the following:

The three minors were detained after real party in interest Contra Costa County Children and Family Services Bureau (Bureau) filed petitions in which it was alleged that the minors came within section 300, subdivision (b) in that "The child's mother suffers from ongoing serious and chronic alcoholism and untreated depression which has resulted in an impaired ability to provide ongoing safe and appropriate care for the child." These allegations were sustained at the jurisdictional hearing.  At the dispositional hearing held on July 31, 2013, the juvenile court adjudged the children to be dependents, adopted the Bureau's case plan, and set a six-month review hearing.

That hearing was held on February 26, 2014.  By that time the court had read the status review report, dated January 31, 2014.  It advised the court of the following:

The minors are together in a foster home and are in good physical condition.  As for their parents, under the heading "Family Assessment Update," Bureau case worker Mubarak stated:

"The mother . . . and the father . . . initially began to participate in their court-ordered family reunification case plan.  They both enrolled in the Ankh Outpatient Behavioral Health Program located in Richmond, and began drug testing in August of 2013.  They also visited regularly with their children.

"On October 5, 2013, a multidisciplinary case conference was held at the Ankh Outpatient Behavioral Health Program after [both parents] tested positive for methamphetamine on September 10, 19, and 30, 2013, respectively.  In attendance were

_____

[2] Much of record deals with petitioner's four other children and their differing fathers.  The father of the three minors at issue here, E.H., appeared in the juvenile court, but is not a party to this proceeding.

2

[both parents], Vanessa Jones, the facility coordinator, Mark Marlot, the one-on-one group facilitator, Andrea Moore, the Youth Services Bureau wrap-around coordinator and the undersigned.  The purpose of the meeting was to address several issues including the positive drug tests and the parents' poor attendance at the Ankh Treatment Program.  Of concern was that both parents attended the treatment program for only 5 days in June 2013.  In July 2013, [petitioner] attended 8 days and [the father] 7 days.  In August 2013 [petitioner] attended 7 days and [the father] 8 days.  In the month of September, [petitioner] only attended the program for 7 days while [the father] did not attend at all.  During the meeting, [petitioner] confessed to drinking alcohol and using methamphetamines on September 16, 2013 through September 20, 2013 as a means of relieving stress.  Based on the parents' drug usage, the recommendation was that they both enter inpatient programs.

"Another issue of concern was the parents' misuse of bus and BART tickets.  Over a 3-month period, [both parents] received a total of 90 bus tickets and 60 dollars worth of BART tickets . . . [Petitioner] confessed that she had been using the bus and BART tickets to visit friends and her cousin instead of using them to attend her treatment program.

"At the meeting, [petitioner] was questioned about why she was always tired. [Petitioner] cited being on 20 mlgs of Celexa for Depression.  YBS wrap-around coordinator, Ms. Moore reported that [petitioner's] psychiatrist attempted to do a psychological evaluation over the summer but the mother stopped going to her appointments with the psychiatrist.  This worker requested a reassessment of the mother's medication and that [petitioner] follow-up with scheduling a psychological evaluation.

"Following the October meeting, attempts were made to assist mother with substance abuse treatment programs.  On the morning of October 21, 2013, the YBS coordinator went to the home of [petitioner] to transport her to the Rectory.  When Ms. Moore arrived at the home, [petitioner] was not home.

3

"On October 23, 2013, it was reported that [petitioner] was incarcerated for fraudulent use of a check and that she was released after 72 hours. There is a pending court hearing on these charges.

"On October 31, 2013, the undersigned received notice from Ankh Behavioral Health that they were concerned that the parents' attendance to their treatment program was poor despite their commitment to improve. The Ankh Program specialist, Ms. Vanessa Jones stated that they were considering dropping both [parents] from the program.

"Following the mother's release from jail, the YBS wrap-around coordinator, Ms. Moore assisted the mother with gaining entrance into inpatient treatment programs. On December 10, 2013, Ms. Moore offered to transport [petitioner] to the Center Point Inpatient Treatment Center in San Rafael for an intake appointment. Upon learning of their Christian-based program, [petitioner] made excuses for not admitting herself into the program. Thereafter, another intake appointment was scheduled at the Rectory for December 16, 2013. Again [petitioner] made excuses on why she could not attend. At this point, it became clear that [petitioner] was unwilling to participate in a substance abuse treatment program without [the father] and risk losing her apartment.[3]

"On January 7, 2014, [both parents] were discharged from Ankh Behavioral Health due to their non-attendance.

"On January 26, 2014, [both parents] called the undersigned to report they were entering the Richmond Rescue Mission Center because they had lost their housing. They indicated that they would be participating in their drug treatment program. However, when the social worker spoke with the facility coordinator, Ms. Kerry, he stated that the couple could stay there but that they were not a substance abuse treatment program that

---

[3] At another point in the report, the case worker stated: "[Petitioner] has expressed to the undersigned worker that her desire to keep her apartment is a priority as it is very hard to obtain one in general. [Petitioner] feels obligated to support [the father] with housing and monetary support since they are legally married."

meets CFS standards.  This information was conveyed to the [parents] and additional referrals including men's inpatient programs were provided to [both parents]."

Case worker Mubarak reviewed aspects of petitioner's compliance with her case plan:

Because of petitioner's arrest, she was not in compliance with the objective "Do not break the law.  Avoid arrests and convictions."

Because of the loss of her apartment, petitioner was not in compliance with the objective "Obtain and maintain a stable and suitable residence for yourself and your children."

As for the objective that petitioner "Stay free from illegal drugs and show your ability to live free from drug dependency.  Comply with all required drug tests," Mubarak stated:  "[Petitioner] has not remained drug-free as noted on the positive drug results.  She admits to usage.  [Petitioner] has not participated in her court mandated case plan and is non-compliant."

That same conclusion—that "[Petitioner] has not participated in her court mandated case plan and is non-compliant"—was Mubarak's conclusion for these case plan objectives:  (1) "Follow all conditions of probation/parole"; (2) "Show your ability to supervise, guide, and correct your children at home, school, and in the community"; (3) "Show your ability to understand your children's feelings and give emotional support"; (4) "Show that you accept responsibility for your actions"; (5) "Comply with medical or psychological treatment"; (6) "Show your ability and willingness to have custody of your children"; (7) "Obtain resources to meet the needs of your children and to provide a safe home"; (8) "Learn to develop/balance a budget and learn to shop within your means"; (9)  "Learn basic meal planning and cooking skills";and; (1) "Develop positive support systems with friends and family."

Other pertinent comments in the report included these:  "Although the parents were provided with referrals on July 12, 2013, October 15, 2013 and January 26, 2014 to drug treatment programs, neither parent has begun to engage in their programs with any degree of consistency.  Both parents have made excuses as to why they could not

5

participate in more than one component of their case plan or the other. They were both discharged from Ankh out-patient drug treatment due to excessive absences." "Although the parents were provided with referrals to parenting classes on July 12, 2013, October 3 and October 15, 2013, neither parent has begun to engage in these classes." Both parents had four positive drug tests in September and October, and have since missed all tests for November, December and January. "Presently, they are not motivated in services in order to resolve their issues of substance abuse and neglect which place their children at risk and impact the children's developmental growth and well-being."

As for visitation: "[Early] visits between the children and parents have been hectic with all seven children, three fathers, the mother and the FFA workers in attendance . . . . [¶] During the initial supervised visits, the FFA workers reported that . . . the mother did not interact or engage the older children [i.e., the four minors not involved here] and the children seemed to be more interested in visiting with each other. . . . It has been noted that mother does not engage with the older children and their inquiries about what is happening and why. . . . [¶] The parents have missed 3 visits with the older boys and 2 visits with the younger children [i.e., the three minors involved here] . . . . All of the boys in particular have expressed at one time or another their not wanting to go to the visit."

Case worker Mubarak further concluded that "Due to the parents' lack of understanding, judgment and displaced priorities with sobriety and participation in their case plan, the prognosis for returning the children to their care and custody at this time is poor," and, he reiterated: "Neither parent is engaging in the court-ordered case plan." Ultimately, he recommended that "the children remain in out-of-home placement, family reunification services be continued to the parents [of only the older] children, and that a 366.26 hearing be set for the . . . children" at issue on this proceeding.

At the start of the February 26 review hearing, the court was advised that petitioner had entered a residential treatment program on February 18, a change in circumstances the Bureau said would not alter its recommendations. Case worker Mubarak testified that he has been the case worker since June 2013. He described

6

petitioner's attitude as "pretty much uncooperative," which was frustrating, "to say the least" When asked in effect why the Bureau had not provided more psychiatric services, Mubarak responded: "She actually has a psychiatrist who she [petitioner] was supposed to do an assessment with in the summer, and her wrap-around coordinator, Ms. Andrea Moore was taking her to these appointments, but she stopped going. [¶] . . . [¶] . . . That assessment would have assisted in more mental health services for her. " The fact of petitioner's recent entry into a residential treatment was insufficient to "show any change . . . in mother's behavior patterns. [¶] Not for five days, no."

Mubarak further testified that petitioner has not provided a drug test since October of 2013. That same month, petitioner falsely told Mubarak she was on the waiting list for a treatment facility. In November of 2013, another facility for which petitioner said she was on the wait list told Mubarak that "all she [petitioner] had to do was call and do her intake." After being contacted by Mubarak, the facility "told her to come that following Monday to do her intake, and she refused to go."

On cross-examination, Mubarak testified that petitioner "has been visiting the younger children [the minors at issue here] pretty regularly." Mubarak could not recommend that return of the minors to petitioner would be safe without her completing "a six-month program at the very least with follow up . . . in an after-care program" of another six months. Petitioner would also have to complete the psychiatric assessment, and commence and complete a domestic violence prevention program. Petitioner had been offered a "domestic violence referral." Petitioner seemed "very nurturing" when she visited the children, but, for Mubarak, "I feel like there could have been more of an opportunity for her to have more time with her children had she been in a program a lot earlier that would allow for children to be in the program, had things moved in a different direction early on."

Petitioner testified on her own behalf, and said that Mubarak told her "back in November, October" that she "needed to go into an in-patient [drug treatment] program." Petitioner was calling various programs "every other day." Petitioner conceded she was "kicked out of Ankh" for lack of attendance, but that was because she was trying to get

7

into a residential treatment program. "I thought I had to go straight into in-patient, so I didn't—that wasn't my—then I found out later that I was suppose to still complete—still go into out-patient." The residential program she is now in is "a 90-day program, but . . . I'm going to take it for six months" and then "I'm going to go to living sober program that's in Fairfield." The residential treatment program in which she is currently enrolled offers domestic violence, addiction education, women's issues, and parenting classes, which she is just starting. She has been attending Alcoholics and Narcotics Anonymous meetings.

Petitioner further testified that she graduated from a treatment program in "2007, 2008," has relapsed, but "now is going to be different" because "I'm ready . . . to be in recovery and change my life and be a mother . . . for me and my kids. . . it's time for me to get myself together." If the court gives her the chance, "I can do it."

On cross-examination, petitioner conceded that after being ejected from the Ankh program she did not "do any substance abuse treatment at all." She also admitted that she had graduated from another treatment program in 2004. Actually, there had been two additional in-patient programs which she did not complete. Petitioner further conceded that she has not been tested since October. Petitioner suffers from depression, but that condition has not interfered with her ability to stay in a residential treatment program.

The court then heard argument from petitioner and the father, who each urged that additional reunification services be provided. Counsel for the children supported the Bureau's recommendation, and with respect to petitioner stated: "We have three attempts at treatment, three relapses, three failures. We have a parent who did not cooperate with the Department, didn't get a mental health assessment, didn't get DV [domestic violence]. I think she's a lovely woman, very nice. She's got a lot of problems. I know she's trying hard. These children shouldn't have to wait—they need a parent now . . . . [¶] I don't think we should gamble. I think the Court should support the Department's position because it's in the best interests of the children." For the Bureau's counsel, "I don't even think this is a minimally close call for the Court, where nine and a half months after removal, seven months after disposition . . . a three-year-old and . . .

8

one-and-a-half-year-old twins . . . . [¶] . . . [¶] . . . Given that we've come nine and a half months since removal, and we have, at best, ten days of sobriety, I think . . . there's no way the Court would be able to find a substantial probability of return."

The court then accepted the Bureau's recommendations. "I'm convinced . . . there is no extraordinary . . .[or] special circumstances. Mother even said herself that she has her depression under control." Although petitioner "finally appears to have gotten serious. . . . there has been a complete failure to participate regularly in the services and the court-ordered treatment plan." Following that, the court then made the statutorily-mandated findings, augmenting its earlier remarks:

"I find by clear and convincing evidence that the Children and Family Services Bureau has provided or offered reasonable services to the parents which were designed to aid the parents in overcoming the problems which led to the initial removal and continued custody of each child.

"I find by clear and convincing evidence that the return of the children to the custody of their parents would create a substantial risk of detriment to the safety, protection or physical, emotional well-being of each child. [¶] . . .[¶]

"I find by clear and convincing evidence that the parents have failed to participate regularly in the court-ordered [reunification] program.

"I note that they were not . . . participating regularly in the out-patient program over several months. They had an opportunity to do that. They did not. They did not do the parenting classes. They failed on the drug testing. They did make some visits. Mother failed to have her psychological assessment done. There was just too many instances of complete failure to participate regularly.

"I find by clear and convincing evidence that there is not a substantial probability that the children will be returned to the physical custody of their parents by July 10, 2014,[4] even if I extend services to that date."

---

[4] "Family reunification services, when provided, shall be provided as follows: [¶] . . . [¶] For a child who, on the date of initial removal from the physical custody of his or her parent . . . was under three years of age, court-ordered services shall be provided

9

# REVIEW

As previously mentioned, petitioner hopes to have the order overturned because reunification services should not have been terminated, and because the juvenile court "disregarded" her mental illness.  That hope cannot succeed.

Absent unusual circumstances not present here, when a child is removed from a parent's custody, the Bureau must provide child welfare services to the parents to facilitate reunification of the family.  (§ 361.5, subd. (a).)  The services must be tailored to the particular needs of the parents and designed to eliminate the conditions that led to the child's removal from their custody.  (*In re Alanna A.* (2005) 135 Cal.App.4th 555, 563; *David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 793.)  "[T]he record should show that the supervising Bureau identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult . . . ."  (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.)  " 'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' "  (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 598-599; *Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.)

The juvenile court's finding that the Bureau offered reasonable reunification services will be upheld if it has the support of substantial evidence.  (*Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1018; *In re Joanna Y.* (1992) 8 Cal.App.4th 433, 439.)  We must determine whether there is any substantial evidence, contradicted or not, to support the court's conclusion.  (*In re Katrina C.* (1988) 201 Cal.App.3d 540, 547.)  Substantial evidence is "evidence which is reasonable, credible and of solid value . . . ."  (*In re Jasmine C.* (1999) 70 Cal.App.4th 71, 75.)

---

for a period of six months from the dispositional hearing . . . , but no longer than 12 months from the date child entered foster care . . . ."  (§ 361.5, subd. (a)(1)(B).)  The date mentioned by the court is presumably that at which the minors would have been in foster for exactly one year.

10

Applying these standards, we conclude the juvenile court's finding is amply supported by substantial evidence.

As for the reunification services offered by the Bureau under her case plan, petitioner does not argue they were inadequate in either conception or execution. The one particular she obliquely references is the absence of attention paid to her "mental illness." What services would be provided to that end were obviously predicated on the assessment or evaluation that petitioner's own psychiatrist was to complete, with petitioner being driven to meetings with the psychiatrist by Ms. Moore. But it was petitioner who prevented completion of the psychiatric assessment when she "stopped going" to appointments. As for petitioner's depression, she testified that it was "under control" and has not affected her recovery. Thus, there was no "disregarding" by the juvenile court.

Much of the case plan's adequacy and efficacy cannot be known because of petitioner's comprehensive refusal to take advantage of the reunification services offered. The Bureau was not required to " 'take the parent by the hand and escort . . . her to and through classes or counseling sessions,' " just as "it is not the court's role to force a parent to participate in services. 'It is . . . well established that "[r]eunification services are voluntary, and cannot be forced on an unwilling or indifferent parent. [Citation.]" ' " (*In re Nolan W*. (2009) 45 Cal.4th 1217, 1223.) "While reunification is the preferred outcome when it serves the interests of both parent and child, no interest is well served by compelling . . . parents to shoulder responsibilities they are unwilling to accept or unable to discharge." (*Id*. at p. 1224.)

"A noncustodial parent may not refuse to participate in reunification treatment programs until the final reunification review hearing has been set and then demand an extension of the reunification period to complete the required programs. [Citations.] Neither may a parent wait silently by until the final reunification review hearing to seek an extended reunification period based on a perceived inadequacy in the reunification services occurring before that hearing." (*Los Angeles County Dept. of Children Etc. Services v. Superior Court* (1997) 60 Cal.App.4th 1088, 1092-1093.) Although petitioner

11

understandably points to her decision to enter the residential treatment program, in light of her extensive substance abuse history, the court was not required to give it the same significance.

"Substance abuse is notoriously difficult for a parent to overcome," particularly when facing the loss of children.  Thus, "[e]xperience tells us that such a parent has a high risk of reabuse."  (*In re William B*. (2008) 163 Cal.App.4th 1220, 1228; see *In re Baby Boy H*. (1998) 63 Cal.App.4th 470, 478 ["Experience has shown that . . . the risk of recidivism is a very real concern"].)  A parent's drug consumption "cannot be considered a simple relapse; rather, it was a resumption of drug use demonstrating resistance to treatment."  (*In re William B*., *supra*, at p. 1230; see § 361.5, subd. (b)(13) [no reunification services required if parent "has resisted court-ordered treatment for this problem during a three-year period immediately prior to the filing of the petition . . . or refused to comply with a program of drug or alcohol treatment described in the case plan . . . on at least two prior occasions"].)  In petitioner's case, that consumption continued well into the dependencies.  Her refusal to be tested after failing a number of tests; her expulsion from the Ankh program; and her refusal to follow through with the Bureau's referrals to treatment programs, are also consistent with additional consumption, as well as the obvious refusal to confront the problem.  Petitioner testified to her participation in at least four treatments programs that did not aid her in establishing sobriety.  The juvenile court was within its authority as the trier of fact to make a realistic evaluation of the likelihood of petitioner's anticipated success in the light of her extensive history of disappointed hopes.  (See *In re Rocco M*. (1991) 1 Cal.App.4th 814, 824**;** *In re William B., supra,* 163 Cal.App.4th 1220 at pp. 1228, 1230.)  Particularly because, as the court noted, even the most optimistic scenario would go past the statutory time limit for reunification services.  (§ 361.5, subd. (a)(1)(B), quoted at fn. 4, *ante*.)

### DISPOSITION

The petition is denied on the merits.  This opinion is final forthwith.  (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).)

                                        _____
                                        Richman, J.


We concur:


_____
Kline, P.J.


_____
Brick, J.[*]

_____

[*] Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

13